Argued and submitted July 31, reversed and remanded December 20, 2006

# STATE OF OREGON,
*Respondent,*

*v.*

# MICHAEL FUGATE,
*Appellant.*

CR030051; A122496

150 P3d 409

Stephanie Hortsch, Deputy Public Defender, argued the cause for appellant. On the brief were Peter A. Ozanne, Executive Director, Peter Gartlan, Chief Defender, Legal Services Division, and Monica L. Finch, Deputy Public Defender, Office of Public Defense Services.

Benjamin R. Hartman, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Rosenblum, Judge.

BREWER, C. J.

**BREWER, C. J.**

Defendant appeals a judgment convicting him, after a trial on stipulated facts, of possession of a controlled substance. *Former* ORS 475.992 (2003), *renumbered as* ORS 475.840 (2005). Defendant asserts that the trial court erred in denying his motion to suppress evidence of the contents of a folded piece of tin foil that a police officer opened after defendant handed it to him. The trial court determined that defendant consented to the search. Defendant contends that the search violated Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution because it exceeded the scope of his consent. Because the pertinent facts are undisputed, we review that issue as one of law. *State v. Arroyo-Sotelo*, 131 Or App 290, 294-95, 884 P2d 901 (1994). We reverse and remand.

On January 9, 2002, Officers Huber and Ray went to the home of James Bowie. Ray was following up on the investigation of a stabbing incident. Ray had received information that a red pickup truck was involved in the incident and that the pickup might be found at Bowie's residence. Huber was familiar with Bowie's residence and agreed to accompany Ray.

The officers arrived at Bowie's residence and knocked on the door, and Bowie answered. Bowie stepped outside to speak with the officers. Huber asked for consent to enter the residence, and Bowie gave consent. Huber went inside while Ray remained outside and talked to Bowie about the truck.

Huber found five people, including defendant, inside the residence. Huber was acquainted with all of them except for defendant. Huber asked everyone present for identification, and each person gave him either an identification card or other identifying information. Huber ran a warrant check on all of the people inside the house and then returned their identification cards.

While inside the house, Huber saw a "hard plastic black carrying case that appeared to be a carrying case for a car stereo." Because the officers were interested in the red

pickup truck and because almost everyone in the residence told Huber that "none of them had driven to the residence," Huber asked whom the case belonged to. Defendant said that the case was his. Huber asked what the case contained, and defendant answered that a stereo was inside. Huber asked if he could see it, and defendant opened the case, removed the stereo face plate, closed the case, and showed Huber the stereo.

When defendant opened the case, Huber noticed that defendant lifted it in a manner suggesting that he was trying to keep Huber from seeing something. Huber also noticed a silver object in the case. Huber asked defendant what else was inside the case, and defendant opened it and removed the silver object. At that point, Huber could tell that the object was tin foil.

Huber testified that tin foil "is commonly used for the consumption, inhalation, and storage of illegal narcotics." Huber suspected that the tin foil contained controlled substances based on his previous contacts with "individuals that were in that room." However, Huber did not believe that he had probable cause to conclude that a controlled substance was inside the tin foil. When defendant removed the tin foil from the case, Huber asked defendant "if I could see it." Defendant handed the tin foil to Huber. Huber asked defendant what was inside the foil, and defendant said that he did not know. Huber then unfolded the foil and saw what appeared to be burnt residue. Huber asked defendant "what he used the tinfoil for," and defendant again said that he did not know. Huber then asked defendant to step outside the residence, and defendant complied. Huber then questioned defendant further. Defendant admitted that the tin foil was his and said that he had used it earlier that day to smoke "crank."[1]

Huber asked defendant if he had any more methamphetamine, and defendant said no. Huber asked for consent to search defendant, and defendant consented. Huber did not find any other drugs. Huber asked defendant what he

---

[1] A crime lab report later showed that the residue inside the tin foil tested positive for methamphetamine.

and the other people were doing inside the residence before the officers arrived. When defendant hesitated, Huber told him that he did not have to answer that question, and defendant said that he would rather not answer.

Before trial, defendant moved to suppress evidence of the methamphetamine residue that Huber found inside the tin foil. Among other grounds for suppression,[2] defendant asserted that, by opening the folded tin foil, the officer exceeded the scope of any consent that defendant had manifested by handing the foil to him. The trial court denied the motion. Regarding the scope of consent issue, the court said:

> "It is not clear to me if [defendant] consented to the opening of the foil, but he did consent to Officer Huber looking at it. Looking at it, at least in the context of a folded piece of foil, reasonably implies looking in it. If that were not enough, I think Officer Huber's training and experience suggests that it may contain a controlled substance.
>
> "He does look in the foil and determines that there is a residue of a controlled substance, or a burnt controlled substance inside of the aluminum foil and he makes some further inquiry. He asks if it is methamphetamine and eventually that is admitted. * * *
>
> "* * * * *
>
> "* * * Essentially, everything that was obtained was obtained in the course of a mere encounter or was obtained through consent. Therefore, the motion to suppress is denied."

Evidence that Huber opened the tin foil and found the methamphetamine residue inside, and defendant's statements after that discovery was made, were admitted in the ensuing stipulated facts trial.

Consent to a search is a recognized exception to the warrant requirement of both the state and federal constitutions. *State v. Weaver*, 319 Or 212, 219, 874 P2d 1322 (1994) (discussing consent exception to the warrant requirement under Article I, section 9); *see also Schneckloth v. Bustamonte*, 412 US 218, 222, 93 S Ct 2041, 36 L Ed 2d 854

---

[2] Defendant does not renew any of the other grounds for suppression that he asserted before the trial court, and we do not address them.

(1973) (same under the Fourth Amendment). However, the scope of the permissible search is limited to the consent given. *State v. Allen*, 112 Or App 70, 74, 826 P2d 127, *rev den*, 314 Or 176 (1992). When the state relies on consent to support a search, it must prove by a preponderance of the evidence that officials complied with any limitations on the scope of the consent. *State v. Paulson*, 313 Or 346, 351-52, 833 P2d 1278 (1992). The scope of a person's consent does not turn on what the person subjectively intended. *State v. Jacobsen*, 142 Or App 341, 349, 922 P2d 677 (1996). Rather, it turns on what a reasonable person would have intended. *Arroyo-Sotelo*, 131 Or App at 294-96. The specific request that the officer made, the stated object of the search, and the surrounding circumstances all bear on our determination of the scope of a person's consent. *Id.*

At the threshold, the state argues that we need not address whether the officer exceeded the scope of defendant's consent when he unfolded the tin foil. The state asserts that, in any event, the folded tin foil announced its contents and, therefore, the examination of those contents did not constitute a search.[3]

█ In *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986), the Supreme Court stated:

> "Some containers, those that by their very nature announce their contents (such as by touch or smell) do not support a cognizable privacy interest under Article I, section 9. Transparent containers (such as clear plastic baggies or pill bottles) announce their contents. The contents of transparent containers are visible virtually to the same extent as if the contents had been discovered in 'plain view,' outside the confines of any container. * * * No warrant is required for

---

[3] It is not clear whether the state adequately raised and developed this argument before the trial court. However, defendant has not asserted on appeal that he lacked an opportunity to fairly meet the argument before the trial court and that, as a consequence, we should not consider it. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 660, 20 P3d 180 (2001) ("[E]ven if the record contains evidence sufficient to support an alternative basis for affirmance, if the losing party might have created a *different* record below had the prevailing party raised that issue, and that record could affect the disposition of the issue, then we will not consider the alternative basis for affirmance." (Emphasis in original.)). Instead, defendant has addressed the argument at length on its merits. Accordingly, we address it as well.

the opening and seizure of the contents of transparent containers or containers that otherwise announce their contents."

In *State v. Herbert*, 302 Or 237, 242, 729 P2d 547 (1986), the court elaborated:

"Some containers of illicit drugs may be so uniquely associated with the storage and transportation of controlled substances that their unique packaging alone might provide, to an officer with training and experience in the area of drug detection, probable cause to believe they contain a controlled substance. Examples of such unique containers might be balloons or *tinfoil bindles*."

(Emphasis added.) The state relies on *Herbert* and *State v. McCrory*, 84 Or App 390, 734 P2d 359 (1987), for the proposition that "tin foil bindles are precisely the sort of containers that announce their contents[.]"

■ ■ We disagree with that proposition; it confuses the inquiry whether probable cause to search existed with the issue whether a search occurred at all. "Probable cause" to conduct a warrantless search does not require certainty. *State v. Collicott*, 56 Or App 605, 608, 642 P2d 1187, *rev den*, 293 Or 190 (1982). In general, probable cause to search exists when a reasonable person would believe it is more likely than not that the objects of a search will be found at the location to be searched. *State v. Anspach*, 298 Or 375, 380, 692 P2d 602 (1984). By contrast, the contents of opaque containers that "announce" their contents "are visible virtually to the same extent as if the contents had been discovered in 'plain view,' outside the confines of any container." *Owens*, 302 Or at 206; *see also State v. Gilkey / White*, 172 Or App 95, 104 n 5, 18 P3d 402 (2001). Thus, examination of the contents of containers that "announce their contents" is not a search at all. In that situation, an officer needs neither probable cause nor an exception to the warrant requirement to examine the container's contents. In contrast, when a container does not announce its contents, but an officer nonetheless has probable cause to believe that it contains contraband, the officer may examine its contents only if an exception to the warrant requirement applies. *See State v. Stock*, 209 Or App 7, 12 n 1,

146 P3d 393 (2006) (discussing distinction between containers that announce their contents and those that provide probable cause).

 A similar problem was addressed in *State v. Walker*, 173 Or App 46, 20 P3d 834 (2001). There, as here, the state argued, based on *Herbert* and *McCrory*, that an opaque container announced its contents. In addition, as here, the state characterized *Herbert* as holding that probable cause alone gives police the right to open folded bindles believed to contain controlled substances. *Walker*, 173 Or App at 51. We disagreed with both premises:

> "First, the state's premise that probable cause alone can justify a warrantless search contradicts the most fundamental principle of Oregon search and seizure law. A 'search' must be supported by probable cause and either a valid warrant or an exception to the warrant requirement. *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983) ('[W]arrantless * * * searches * * * are *per se* unreasonable unless falling within one of the few "specifically established and well-delineated exceptions" to the warrant requirement.'). Thus, police can lawfully open an opaque container without a warrant in only two circumstances: (1) The container so 'announces its contents' that opening it does not invade a protected privacy interest and, thus, does not constitute a search. *See, e.g., Owens*, 302 Or at 206; [*State v.*] *English*, 164 Or App [580,] 583[, 994 P2d 165 (1999), *rev den*, 331 Or 244 (2000)]; or (2) the opening is supported by probable cause and some exception to the warrant requirement, *e.g.*, officer safety or the automobile exception.

> "Second, *Herbert* and *McCrory* did *not* establish that probable cause *alone* is sufficient to justify a warrantless search of a closed container. Rather, both cases involved exceptions to the warrant requirement. In *Herbert,* exigent circumstances, particularly including the defendant's furtive efforts to distract the arresting officer as defendant attempted to dispose of the paperfold, justified the warrantless opening of the paperfold. 302 Or at 242; *see* [*State v.*] *Kruchek*, 156 Or App [617,] 622 n 2[, 969 P2d 386 (1998), *aff'd by an equally divided court*, 331 Or 664, 20 P3d 180 (2001)]. In *McCrory*, police seized the paperfold during a 'booking in' inventory at a county jail, which we treated as a search incident to arrest. 84 Or App at 392. Here, in contrast, no exception to the warrant requirement applies."

*Walker*, 173 Or App at 51-52 (emphasis in original, footnotes omitted). Thus, *Herbert* and *McCrory* do not assist the state. In both cases, the opening of a paperfold was treated as a search that was justified by probable cause and an exception to the warrant requirement. Here, too, the opening of the folded tin foil was a search. The tin foil was an opaque container, and there was no evidence that such containers invariably contain controlled substances and nothing else.[4] Thus, even if the search was supported by probable cause, the state was required to establish an exception to the warrant requirement in order to justify it. The only exception to the warrant requirement on which the state relies is defendant's consent.[5] So, in the end, the loop closes on the issue of whether the search exceeded the scope of defendant's consent.

When a request to search contains no limitations, and the defendant likewise places no limitations on the consent, the scope of that consent may be broad. *Allen*, 112 Or App at 74. For example, in *State v. Charlesworth/Parks*, 151 Or App 100, 951 P2d 153 (1997), *rev den*, 327 Or 82 (1998), the police arrived at the defendant's home to execute a search warrant for the house. As they arrived, they saw the defendant back his car out of the driveway. The officers blocked the car and ordered the defendant to get out. After informing him that they had a search warrant for the house, one of the officers asked "if it was okay to search his car." *Id.* at 113. The defendant said, "Yeah, go ahead." *Id.* The officers found a

---

[4] In *English*, stipulated testimony established that the officer had "seen other such containers and that, without exception, they always contained marijuana, methamphetamine, or some other controlled substance." 164 Or App at 582. Because the record disclosed no alternative use for the container, we held that "it was probable that the vial contained controlled substances and nothing else." *Id.* at 585. That holding, however, was expressly limited to the facts of that case, which were that the officer testified that he had no cause to believe that the type of container ever held anything other than controlled substances. *See id.* at 584 ("[T]he stipulated testimony * * * is that the sort of small, opaque, plastic vial found in defendant's vehicle is invariably used to store and transport controlled substances. There is no suggestion in the record that it is used for any other purpose."). Here, as in *Walker*, the state produced no such evidence of the exclusivity of use of the tin foil. Accordingly, *English* does not assist the state.

[5] For example, the state does not argue that Huber could have opened the tin foil as a search incident to the constructive arrest of defendant for possession of a controlled substance. *See Owens* (explaining constructive arrest based on observation of container that announces its contents).

briefcase with zippered pockets in the car. They removed the briefcase from the car, took it inside the house, and unzipped it. They examined the contents and found documents that contained information leading the police to discover evidence that the defendant had committed various crimes. The defendant moved to suppress the evidence obtained from the search of his car on the ground that opening the briefcase exceeded the scope of his consent. *Id.* at 113-14. We held that "the officer's request to search [the defendant's] car contained no limitation on the proposed search. In agreeing to the request, [the defendant] placed no restriction on it. On this record, we conclude that the consent to search the car included consent to search things found in the car." *Id.* at 115.

In *Allen*, the officer pulled the defendant's vehicle over for a traffic infraction. After giving the defendant a warning and telling him that he was free to leave, the officer asked the defendant if he had any "weapons, narcotics, or large sums of money" in the vehicle. 112 Or App at 72. The defendant replied that he did not, and the officer asked if he could "check the vehicle for any of the mentioned items." *Id.* at 73. The defendant agreed. A search of the car's interior produced a small quantity of marijuana found in a passenger's purse. The officer then asked the defendant to open the trunk, which he did. He then asked each of the persons in the car to identify his or her luggage. The defendant did so and, while the defendant was still standing there, the officer opened it and found weapons and $13,500. The defendant moved to suppress the evidence of the weapons and the money, arguing, *inter alia*, that the officer had exceeded the scope of his consent. The trial court denied the motion, and we affirmed.

In reaching our conclusion in that case, we closely examined the particular circumstances. We noted that an important factor in determining the scope of a consent to search is the substance of the interchange between the officer and the defendant. We were particularly persuaded in *Allen* by the fact that, when the officer asked for consent, he mentioned that he was looking for particular items, thereby giving the defendant some indication where the officer would be looking. We were also persuaded by the fact that the

searched suitcase was the type of container that might hold the types of items that the officer mentioned. Finally, we were influenced by the fact that the defendant stood by the officer as he conducted the search, but did not withdraw his consent or place any limitations on the search when it became apparent that the officer was going to open his suitcase. Based on those facts, we ultimately concluded that, in that case, the officer did not exceed the scope of the defendant's consent.

We reached a different conclusion in *Arroyo-Sotelo*. In that case, the officer stopped the defendant's vehicle for a traffic infraction. After giving the defendant a warning and telling him that he was free to leave, the officer asked him if there were "narcotics, cocaine, marijuana, heroin or large amounts of currency" in the car. 131 Or App at 292. The defendant replied that there were not. The officer then asked the defendant for consent to search the car, and he responded, "[G]o ahead and look." *Id.* The officer found several thousand dollars in a passenger's purse. The officer then expanded the search by removing screws from the rear passenger door and prying the door panel away from the sidewall. Behind the panel, the officer found a large amount of cash and a plastic bag containing white powder. The defendant moved to suppress that evidence on the ground that the officer exceeded the scope of his consent. The trial court denied the motion, and we reversed.

In so ruling, we explained that the standard for determining the scope of a person's consent to search under both Article I, section 9, and the Fourth Amendment is one of objective reasonableness. *Id.* at 295. We stated that, under that standard, we must determine whether an objectively reasonable person would have understood the particular consent given to include a search of the area at issue. *Id.* As in *Allen*, we emphasized that our ultimate conclusion was dependent on all of the particular circumstances. Again, we noted that the interchange between the officer and the defendant was important; in particular, the substance of the officer's request was significant. In *Arroyo-Sotelo*, the officer asked to search for specific items that could be found in containers and the defendant did not expressly limit his consent. We therefore concluded that the officer's authority to search

was "quite broad." *Id.* at 297. Nonetheless, we held that a reasonable person would not have understood the consent to search under those circumstances to allow the officer to search the space between the door panel and sidewall:

> "Absent specific facts to suggest otherwise, a general consent to search a car does not authorize an officer to search areas of a car that are not designed to be routinely opened or accessed. The fact that [the officer] had to remove two screws and pry a panel away from the sidewall to access the area of the search supports our conclusion that that area was not within the scope of defendant's general consent to a search."

*Id.* at 297-98. We also specifically noted that, unlike the defendant in *Allen*, the defendant in *Arroyo-Sotelo* was not in a position to "voice an objection" to the officer's act of removing the side panel. 131 Or App at 298.

In *Jacobsen*, an officer asked the defendant in the course of "casual * * * conversation" if he could "look" inside the cab of the defendant's truck. 142 Or App at 350. The defendant replied, "Sure" and handed the officer the keys. *Id.* at 343. Because of the casual nature of the conversation and because there was no suggestion from the circumstances that the officer was looking for anything in particular, we concluded that the defendant's consent did not extend to opening a zipped duffel bag that was found in the cab. *Id.* at 350. We said that, given the particular facts of that case—that is, the casual nature of the request merely to "look" inside and the lack of any circumstances suggesting a more specific objective—a reasonable person would not understand the consent to include consent to search zipped duffel bags.

In *State v. Harvey*, 194 Or App 102, 93 P3d 828, *rev den*, 337 Or 657 (2004), we held that a police officer's search of a backpack that was found in the defendant's car did not exceed the scope of his consent to search the car; we concluded that a reasonable person in the defendant's position would have understood that the scope of that request included any compartments or containers in the car that might hold drugs. In reaching that conclusion, we distinguished *Jacobsen*, because, unlike that case, *Harvey* did not involve "casual conversation" and a request merely to "look."

Instead, an officer asked for permission to search the defendant's car because the defendant's car smelled strongly of marijuana, and a second officer had just told the first officer, in defendant's presence, that he had located drug paraphernalia. In response to the request to search, the defendant said to "go ahead" and placed no restrictions on the scope of his consent. *Id.* at 108. We therefore concluded that the trial court had correctly determined that the search of the backpack did not exceed the scope of the defendant's consent.

■ The circumstances of this case are similar in some respects to those found in each of the foregoing cases and, not unexpectedly, they differ in other respects from each of them. This case resembles some of the cases in which a search was upheld, in that defendant placed no express restriction on what the officer could do with the tin foil after defendant handed it to him, and defendant did not object when the officer unfolded it to examine its contents. On the other hand, significant differences exist between those cases and the present case. To place those differences in proper context, we initially note that it was only after defendant said that he did not know what was inside the tin foil that Huber opened the fold and looked inside. The state does not argue, nor do we see how it could be, that defendant's professed ignorance about the contents constituted consent to opening the tin foil. Nothing about that answer bespoke an invitation to look inside. Thus, the critical issue is whether defendant consented to the search of the tin foil's contents when he handed it to Huber. Accordingly, we focus on the facts relating to that act.

As discussed, Huber suspected that the tin foil contained controlled substances based on his previous contacts with "individuals that were in that room." However, there was no evidence that Huber mentioned that suspicion to anyone. In particular, the officer did not tell defendant why he wanted to examine the tin foil. Consistently with that lack of overt investigative focus, the officer never asked defendant for permission to "search"; rather, he asked if he could "see" the tin foil. Again, consistently, defendant did not expressly tell Huber that he could look inside the tin foil; he merely handed it to him.

In that casual, conversational context, Huber himself did not appear to believe that defendant had consented to the opening of the tin foil merely by handing it to him. Instead, after defendant did so, Huber asked him what was inside the foil. If Huber had believed that he had permission to open the fold, he would have had no reason to ask defendant what was inside. Although asking the question most prominently suggested that Huber did not subjectively believe that defendant had consented to the search of the tin foil's contents—which is not relevant here—it also is some evidence that a reasonable person would not have understood that handing over the tin foil in response to the officer's request to "see" it included consent to opening it to examine its contents.

Here, each verbal exchange between defendant and Huber was discrete. Significantly, in none of those exchanges did Huber ask defendant if he could look inside anything. Nor did defendant's nonverbal conduct, just seconds earlier, in opening and closing the black carrying case to show Huber the stereo, indicate anything but a very limited desire to cooperate on the part of defendant. By contrast, in *Allen,* the search of a metal container within a purse was preceded by a request to look inside the purse; the defendant agreed. As a consequence, it was logical to infer that her consent encompassed the opening of other closed containers found within the purse. The same was true in *Charlesworth / Parks* (search of closed container in car preceded by unrestricted consent to request to search car) and *Harvey* (same). We find no similar implicit manifestation of consent to open anything in this case. It is true that, as in *Allen*, defendant here did not object when Huber opened the tin foil. However, there is no evidence that he had a meaningful opportunity to object or, for that matter, that it would have availed him to do so. In the totality of circumstances, we conclude that a reasonable person would have understood that, by handing the folded tin foil to the officer in response to a request to "see" it, defendant was consenting to an examination of the tin foil itself, not to its opening and the examination of its contents. It follows that the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.