Argued and submitted November 5, 2007, reversed and remanded
February 27, 2008

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## GEORGE ALLEN HECKATHORNE,
*Defendant-Appellant.*

Gilliam County Circuit Court
050014CR; A128670 (Control)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## CYRUS DALE HECKATHORNE,
*Defendant-Appellant.*

Gilliam County Circuit Court
050015CR; A128671

179 P3d 693

Erin Galli Rohr argued the cause for appellant. With her on the brief was Chilton, Ebbett & Rohr, LLC.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman and Ortega, Judges.

SCHUMAN, J.

## SCHUMAN, J.

Defendants appeal their convictions for possession of a precursor substance with intent to manufacture a controlled substance, ORS 475.967, assigning error to the trial court's denial of their motion to suppress evidence. They argue that law enforcement officials performed an unlawful search when, during an inventory of the contents of defendants' automobile, and without a warrant, they seized and then later opened and tested the contents of a metal gas cylinder containing, as it turned out, anhydrous ammonia, a precursor substance used in the manufacture of methamphetamine. Defendants contend that the warrantless search was not justified by any exception to the warrant requirement and that the evidence should therefore have been suppressed. The state responds that, because the law enforcement officials were lawfully in possession of the cylinder and it "announced its contents," no search occurred; the contents of the cylinder were, in essence, in plain view. We reverse and remand.

The relevant facts are not in dispute. While responding to a report of a suspicious vehicle in a remote agricultural area of Gilliam County, Undersheriff Bettencourt came upon an automobile parked on private farm property, approximately 200 feet from a group of anhydrous ammonia tanks. Bettencourt knew that anhydrous ammonia, although used legally as farm fertilizer with proper certification, is also a precursor chemical used in making methamphetamine.

The automobile began to move away as Bettencourt approached. He knew that it did not belong to the property's owners. Believing that the occupants were criminally trespassing, he instructed the driver to stop. He then ordered the driver, one of the two defendants in this case, to step out; when the driver complied, Bettencourt conducted a background check that revealed an outstanding felony warrant. On that basis, Bettencourt handcuffed the driver, placed him in the back of the patrol car, and called for back-up.

Two back-up officers arrived shortly thereafter. Having secured the remaining suspects (including the second defendant in this case), Bettencourt peered inside the car. He

noticed a number of items that made him "very suspicious." At that point, he informed the suspects that they were under arrest for trespassing and advised them of their *Miranda* rights. He also asked the driver, the vehicle's registered owner, for his consent to search it, which he declined to give.

The officers then proceeded to inventory the vehicle, discovering a syringe, tools, pipe fittings exhibiting a blue residue, a metal gas cylinder exhibiting the same blue residue around its valve, and a five-gallon propane tank with missing valves. Based, as he testified, on his "[t]raining and experience," Bettencourt knew that "[b]rass and galvanized fittings will turn a turquoise or a fluorescent blue * * * color when contacted by anhydrous ammonia." The inventory also yielded a pipe wrench, pliers, wire cutters, screwdrivers, and rock salt, which, like anhydrous ammonia, are used in making methamphetamine. After completing the inventory, Bettencourt arranged for the vehicle to be towed and transferred the inventoried items to the nearest state police station. He gave the metal gas cylinder to an officer there, who subsequently opened it and tested the contents. That test confirmed that the cylinder contained anhydrous ammonia.

Defendants were charged with possession of a precursor substance with intent to manufacture a controlled substance. They each moved to suppress the metal gas cylinder and its contents on the ground that it was seized unlawfully under both Article I, section 9, of the Oregon Constitution and the Fourth and Fourteenth Amendments to the United States Constitution, because police failed to obtain a warrant to search the vehicle and the search was not justified under any exception to the warrant requirement. The trial court denied defendants' motions, ruling that the cylinder had been lawfully seized as part of a valid inventory and that a search warrant was not required to test the cylinder's contents given its distinctive blue coloration, which indicated that it was an "instrumentalit[y] of a crime."

On appeal, defendants do not dispute that the cylinder was seized during a lawful inventory of the automobile's contents. Rather, they argue that the warrantless opening of the cylinder and testing of its contents cannot be justified under any exception to the warrant requirement; they focus

on the "search incident to an arrest," "automobile search," and "inventory search" exceptions. In its response, the state, while not expressly conceding that the other exceptions do not apply, relies exclusively on the argument that this cylinder, which exhibited a distinctive blue coloration that Bettencourt immediately recognized could result only from contact with anhydrous ammonia, "announced its contents." That being the case, according to the state, opening the cylinder was not a search and, under well-settled case law, confirmatory testing of its contents did not violate any protected possessory interest and was therefore not a seizure.

Article I, section 9, of the Oregon Constitution protects both privacy and possessory interests.[1] *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986). Under that provision, a "search" occurs when a person's privacy interests are invaded by the state. *Id.* A "seizure" occurs when there is significant state interference with a person's possessory or ownership interests in property. *Id.* at 207. "[W]arrantless * * * searches * * * are *per se* unreasonable unless falling within one of the few 'specifically established and well-delineated exceptions' to the warrant requirement." *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983) (quoting *Katz v. United States*, 389 US 347, 357, 88 S Ct 507, 19 L Ed 2d 576 (1967)). Accordingly, Article I, section 9, requires that a police officer have probable cause and a valid warrant or justification under an exception to the warrant requirement before a search can lawfully occur.

Not all government intrusions, however, trigger constitutional protection. *Owens*, 302 Or at 206. Police observation of an item in plain view from a lawful vantage point, for example, is not a search because no privacy right is violated. *E.g.*, *State v. Gohring*, 311 Or 33, 39, 803 P2d 1189 (1991) (unaided aerial observation of marijuana plants). Furthermore, if an officer observes evidence of a crime or contraband in plain view from a lawful vantage point and has lawful access to that evidence, she may seize it. *E.g.*, *State v. Ready*, 148 Or App 149, 156, 939 P2d 117, *rev den*, 326 Or 68 (1997)

---

[1] Article I, section 9, of the Oregon Constitution provides, in part: "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure."

(videotapes labeled "kid porn"); *State v. Russell*, 118 Or App 652, 656, 848 P2d 657, *rev den*, 317 Or 272 (1993) (marijuana plants).

Applying these precepts, the Supreme Court has held that "[s]ome containers, those that *by their very nature announce their contents*[,] * * * do not support a cognizable privacy interest under Article I, section 9[,]" because such containers are "visible virtually to the same extent as if the contents had been discovered in 'plain view,' outside the confines of any container." *Owens*, 302 Or at 206 (emphasis added). Examination of the contents of a container that announces its contents is therefore not a "search" at all—an officer needs neither a warrant based on probable cause nor justification under an exception to the warrant requirement. *State v. Fugate*, 210 Or App 8, 14, 150 P3d 409 (2006). Nor is a test to confirm the identity of those contents a "seizure," because the additional retention of the lawfully seized item for the limited purpose of chemical analysis does not constitute a substantial interference. *Owens*, 302 Or at 207. "In contrast, when a container does not announce its contents, but an officer nonetheless has probable cause to believe that it contains contraband, the officer may examine its contents only if [she first obtains a warrant or] an exception to the warrant requirement applies." *Fugate*, 210 Or App at 14.

As we noted in *State v. Stock*, 209 Or App 7, 11 n 1, 146 P3d 393 (2006), the distinction between whether a container "announces its contents" and whether an officer has probable cause to believe that a container holds contraband has been blurred in some of our cases. *See also Fugate*, 210 Or App at 14 (clarifying that distinction). While these two inquiries are closely related, they are nevertheless distinct:

> "When a container, because of its unique or transparent quality, announces its contents, there is no search at all. When a container does not announce its contents but— because of its nature and the context in which it is found— can be said more likely than not to contain contraband, there is a search, but one that may nevertheless be justified by a recognized exception to the warrant requirement. The result often may be the same, but the analytical paths are distinct."

*Stock*, 209 Or App at 11 n 1 (citations omitted). Probable cause exists when an officer's subjective belief that it is more likely than not that a particular container contains contraband is objectively reasonable. *Id.* at 13. Whether that belief is reasonable depends on a combination of factors, including the nature of the container itself, the context in which it is found, and the knowledge and experience of the officer who found it. *Id.*

In contrast, "[w]hether a container announces its contents depends on whether those contents are so plainly obvious that there is no privacy interest to protect." *Id.* at 12. The analysis is analogous to that of plain view:

> "[I]t depends only on the nature of the container itself—*i.e.*, whether by its smell, appearance, or other directly observable features, it 'announces its contents'—and is thus independent of the context in which the container was found or the subjective knowledge and experience of the officer who found it."

*Id.* Opening such a container results in no greater invasion of privacy than has already occurred by the officer's viewing it. *State v. Kruchek*, 156 Or App 617, 622-23, 969 P2d 386 (1998), *aff'd by an equally divided court*, 331 Or 664, 20 P3d 180 (2001). Thus, it also follows that containers that announce their contents must do so in a way that asserts that contraband is their *sole* content to ensure that opening those containers will not reveal other unknown contents, thereby constituting a search. *Id.* at 622; *see also State v. Dickerson*, 135 Or App 192, 195-96, 898 P2d 193 (1995) (officer's opening of pocketknife revealing evidence of tire slashing constituted a search where knife announced only that it contained a blade).

Transparent containers such as plastic baggies or pill bottles invariably announce their contents. *Owens*, 302 Or at 206. Certain opaque containers, for example a videotape whose contents are identified by a written label, also make such an "announcement." *Ready*, 148 Or App at 156. On the other hand, a film canister, a bubble bottle, a bottle cap bent around a small plastic bag, and a tin foil bindle do not announce their contents because those items are not so uniquely associated with carrying drugs that the contents of

each is effectively in plain view. *State v. Lane*, 135 Or App 233, 240, 898 P2d 1358 (1995); *State v. Walker*, 173 Or App 46, 50, 20 P3d 834 (2001); *Stock*, 209 Or App at 12-13; *Fugate*, 210 Or App at 16. In other words, there is nothing about such items, *per se*, that could "be said to announce to the world that [they] contain[ ] drugs and only drugs." *Stock*, 209 Or App at 12. A cognizable privacy interest thus remains in the contents of each, and an officer's opening them results in a search requiring either a warrant or justification under an exception to the warrant requirement.

■     This review of what we might call "content announcement" cases compels the conclusion that, although the Supreme Court and this court have recognized the theoretical possibility that an opaque container can "announce[ ]" its contents "to the world," *Walker*, 173 Or App at 50, such containers are extremely rare. The videotape that was literally labeled with its contents did so. *Ready*, 148 Or App at 156. We held that a particular type of glass vial did so in *State v. English*, 164 Or App 580, 584, 994 P2d 165 (1999), but that conclusion has been disavowed. *Stock*, 209 Or App at 11 n 1. Although we do not now categorically foreclose the possibility that an unlabeled opaque closed container might announce its contents, we conclude that such a container must make that announcement unequivocally and "to the world," and not merely to those who have special expertise derived from training or personal experience. *Id.* at 12 (Whether a container announces its contents is an inquiry "independent of * * * the subjective knowledge and experience of the officer who found it.").[2]

---

[2] The contents of a transparent container may be seized because they are in plain view, and under the "plain view" exception, an officer can seize the viewed object even if its nature as contraband or evidence is apparent only to those with experience or expertise. The contents of an opaque container, on the other hand, are not in plain view—the plain view analysis applies only by analogy. The opening of a closed opaque container will always involve more risk of invasion of a protected privacy interest. *See, e.g., Kruchek*, 156 Or App at 622 (opening an opaque closed container that does not announce contraband as its sole content violates privacy interest because it might reveal other contents not yet known). For that reason, we require that the "announcement" of contents in such situations be unequivocal and comprehensible to those without expertise.

In this case, the state contends that the cylinder valve's characteristic blue coloration—"coupled with its presence near other items used in the manufacture of controlled substances and items indicating possession of illegal drugs—not only gave [Bettencourt] probable cause to believe this [cylinder] contained controlled substances, but it announced its contents as unlawful contraband." That argument, however, exemplifies the confusion discussed above; whether Bettencourt had probable cause to believe that the cylinder contained anhydrous ammonia and whether the cylinder announced its contents are two different inquiries. Although Bettencourt undoubtedly possessed sufficient probable cause to obtain a search warrant, he did not do so. Whether he was nevertheless constitutionally permitted to examine the cylinder's contents turns on whether those contents were visible as if they had been discovered in plain view, an inquiry independent of the context in which the cylinder was found.

Applying the foregoing principles to this case, we conclude that the cylinder did not announce its contents. Although some chemists, some trained police officers, and some farmers might perceive the blue coloration on a metal cylinder as the functional equivalent of a label declaring "Contents: Anhydrous Ammonia," those persons comprise only an extremely small segment of the citizenry. Had the cylinder been so labeled, Bettencourt could have relied on his training and experience in determining whether the contents announced were contraband. However, because those contents were not announced "to the world," and thus were not in plain view, opening the cylinder was an invasion of a protected privacy interest, and Bettencourt was required to secure a warrant before performing any confirmatory testing.

Reversed and remanded.