Argued and submitted August 4, 2008, cross-appeal dismissed September 30, 2009

## STATE OF OREGON,
*Plaintiff-Appellant,*
*Cross-Respondent,*

*v.*

## DONALD LEE BELLAR,
*Defendant-Respondent,*
*Cross-Appellant.*

## Multnomah County Circuit Court
050230673; A129493

217 P3d 1094

Rankin Johnson IV argued the cause for respondent - cross-appellant. With him on the briefs was Philip A. Lewis.

Joanna L. Jenkins, Assistant Attorney General, argued the cause for appellant - cross-respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

EDMONDS, P. J.

Sercombe, J., dissenting.

## EDMONDS, P. J.

The appeal in this criminal case charging defendant with 40 counts of encouraging child sexual abuse in the second degree, ORS 163.686, was initiated by the state after the trial court allowed in part and denied in part defendant's motion to suppress evidence. Defendant cross-appeals pursuant to ORS 138.040[1] from the part of the order denying the motion to suppress. Subsequently, the state dismissed its appeal. The threshold issue before us is whether, under ORS 138.040, we may exercise our discretion to consider defendant's cross-appeal after the state has dismissed its appeal. We conclude that, under the holding in *State v. Shaw*, 338 Or 586, 113 P3d 898 (2005), we are required to dismiss defendant's cross-appeal.

The trial court's order recites that the charges against defendant arose out of the discovery of images of child pornography on defendant's computer by a computer repair technician. The evidence sought to be suppressed by defendant consisted of his statements and computer images depicting child pornography. In September 2003, defendant took his computer to a repair shop owned by Wells. Defendant asked Wells to repair his computer and to copy files from the hard drive so they could be loaded on defendant's new computer. Part of that process involved Wells copying files from defendant's computer onto his own computer in order to preserve those files in the event that there was a problem in restoring the files to defendant's computer. While copying the files to his computer, Wells came across a file with a name that Wells associated with gaming activities. Wells was uncertain whether defendant wanted the file copied to his new computer. Consequently, he opened the file and discovered multiple images of what appeared to be children engaged in sexual acts.

---

[1] ORS 138.040 provides, in part:

"Except as provided under ORS 138.050, the defendant may appeal to the Court of Appeals from a judgment or order described under ORS 138.053 in a circuit court, and may cross-appeal when the state appeals pursuant to ORS 138.060(1)(c) or (2)(a). The following apply upon such appeal or cross-appeal:

"(1) The appellate court may review:

"(a) Any decision of the court in an intermediate order or proceeding."

After defendant picked up his computer from Wells, Wells reported his discovery to his mother, who works for the Multnomah County Sheriff's Office. A few days later, Wells was contacted by a Multnomah County sheriff deputy who informed him that the report would be referred to the City of Portland Police Bureau. Wells heard nothing further until approximately two months later when he was contacted by Multnomah County Sheriff Deputy Biles. In the interim, Wells had decided to copy defendant's files that existed on his own computer. He transferred those files to a CD and then deleted them from his own computer.

When Biles contacted Wells, Wells offered to give the CD containing defendant's computer files to Biles. Biles took the CD and went back to his office, put the CD in his computer, viewed the images, and confirmed that the images depicted child pornography. The investigation was then determined to be within the jurisdiction of the Portland Police Bureau and transferred to that agency.

Andrews, a detective with the Portland Police Bureau, viewed the CD with defendant's files on it that had been made by Wells. The "gaming" file opened by Wells was determined to contain 287 pornographic images. Andrews also viewed another file entitled "Thumbs 31" belonging to defendant that was on the Wells CD and found more images of child pornography. Andrews then procured a search warrant for the search of defendant's residence. When the officers executing the search warrant contacted defendant, they had him read a written *Miranda* warning and defendant signed a consent form agreeing to speak with the officers. During the ensuing interview, defendant admitted that he knew that the images of child pornography existed on his computer but explained that the images had been put there by the person from whom he had bought the computer. While the interview was ongoing, the police seized a number of personal items including computers and computer files from defendant's residence and subsequently opened or viewed those computer files.

After defendant was charged, he initially moved to suppress the evidence that the police obtained from his computer files at his residence, arguing that the search warrant

obtained by the police did not authorize a search of his computers and related electronic storage media. In a supplemental motion to suppress, he argued that the police impermissibly expanded Wells's private search of defendant's files by examining a copy of the files provided by Wells without a warrant. In a second supplemental motion, he contended that the initial copying of his computer files by Wells was done at the direction of law enforcement officials. Additionally, defendant filed a motion to controvert contents of the affidavit that the police had filed in support of their request for a search warrant, and he moved to suppress his statements that were made contemporaneously with the search of his residence.

The trial court, in a memorandum opinion and a supplemental memorandum opinion, agreed with defendant's initial motion to suppress. It reasoned that the language in the warrant did not authorize the police to look at the images on the computers and disks seized from defendant's residence. According to the trial court, the warrant was supported by probable cause and authorized the search of defendant's residence for a list of items in the warrant and a seizure of those items but not a subsequent search or viewing of the contents of the seized items. It rejected defendant's argument that Wells was acting as an agent of the police. The court also granted defendant's supplemental motion to suppress evidence obtained as a result of the police viewing the file contained on the CD provided to them by Wells but only to the extent that their search exceeded the scope of the private search by Wells. The trial court also denied defendant's motions to controvert the evidence and to suppress the statements that he made to the detectives at the time the search warrant was executed.

Pursuant to its rulings, the court entered an order suppressing the evidence that police obtained through the search of items seized from defendant's residence and granting and denying in part the supplemental motion to suppress evidence that the "police obtained in connection with their review of the CD provided to them by computer repairman Ron Wells." The order also denied defendant's second supplemental motion to suppress, defendant's motion to controvert, and defendant's motion to suppress the statements that he

had made to police. The state appealed. In its notice of appeal, the state stated, "State of Oregon, Plaintiff, hereby gives notice of appeal from the ORDER GRANTING DEFENDANT'S MOTIONS TO SUPPRESS[.]" Four days later, defendant filed a notice of cross-appeal appealing "to the extent [the order] denied portions of defendant's motion to suppress." Defendant also cross-appealed from other pretrial orders entered by the trial court. Approximately one year later, the state moved to dismiss its appeal, citing the following reasons:

> "After careful evaluation of this appeal, and after consultation with the Multnomah County District Attorney's Office, the state has concluded that it would be more expeditious to reseize the challenged evidence by means of a search warrant, rather than to pursue this appeal of the trial court's order suppressing evidence obtained from defendant's computer."

Defendant thereafter continued to pursue his cross-appeal, making five assignments of error, three of which pertain to the trial court's rulings on the motions to suppress: (1) The trial court erred by denying defendant's motion to suppress the results of Bile's view of the CD provided by Wells; (2) The search warrant was the product of the prior unlawful search of the CD; and (3) The statements obtained from defendant were the product of an illegal search.

In *Shaw*, the court identified, for the first time, the circumstances under which appellate courts should elect to exercise their statutory discretion to review a defendant's cross-appeal under ORS 138.040. 338 Or at 617. In other words, the court's holding in *Shaw* effectively defines the boundaries of our discretion to consider defendant's cross-appeal. The initial holding in *Shaw* is that the exercise of discretion under ORS 138.040 to review a defendant's cross-appeal should be exercised "only sparingly." *Id.* at 618.

The reasons for that limitation are two-fold, according to the *Shaw* court. First, a defendant, unlike the state, has a full opportunity to challenge any intermediate adverse trial court ruling if the defendant is convicted. If a defendant is acquitted, then any intermediate rulings become moot. Accordingly, a limitation on the exercise of discretion under

ORS 138.040 of a defendant's cross-appeal promotes judicial economy at the appellate level, thereby negating the possibility of the expenditure of judicial time and resources on issues that will not arise unless the defendant is convicted. *Id.* at 618.

Second, a state's pretrial appeal necessarily prolongs the pendency of a criminal proceeding against a defendant and may in some cases result in the defendant remaining in custody during the pendency of the appeal. The consideration of a cross-appeal by this court, along with the state's appeal, together with the possibility of review by the Supreme Court, only adds to the delay of the defendant being brought to trial. In the *Shaw* court's view, those considerations "strongly support[ ] the view that this court should limit the exercise of its discretion under ORS 138.040 to review a defendant's challenges to a trial court's intermediate rulings raised by cross-appeal." *Id.* at 618.

In addition to expressing the policies underlying the limitation on the discretion of an appellate court under ORS 138.040, the *Shaw* court undertook to define the circumstances regarding when that discretion should be exercised:

"In light of the considerations articulated above, we conclude that, in respect [to] a defendant's cross-appeal, this court's ordinary practice will be to limit its consideration only to those assignments of error that are inextricably linked, either factually or legally, to the state's assignments of error on appeal. Only under those factual circumstances can we reasonably be assured that our review of a defendant's assignments of error on cross-appeal will not contribute unnecessarily to the delay from a state pretrial appeal under ORS 136.060(2)(a)."

338 Or at 618-19.

The question then becomes, under *Shaw*, whether defendant's assignments of error are inextricably linked, either factually or legally, to the state's assignments of error to the trial court's ruling that the search warrant authorized a seizure of defendant's personal effects but not a search of their contents.[2] We conclude that the requirements of the

---

[2] We note that given the holding in *Shaw*, our decision in *State v. Atkinson*, 64 Or App 517, 669 P2d 343 (1983), *aff'd*, 398 Or 1, 688 P2d 832 (1984), does not require a different result. *See* 231 Or App at 98 (Sercombe, J., dissenting).

*Shaw* test are not satisfied by the record underlying defendant's cross-appeal. The state appealed principally from a ruling regarding the scope of the search warrant and whether its language authorized the police to open the computer files that had been seized from defendant's residence. The body of law that governs that issue is unrelated to the jurisprudence that governs defendant's assignments of error. In reaching its conclusion regarding the scope of the warrant's authorization, the trial court relied on *State v. Carter*, 200 Or App 262, 113 P3d 969 (2005), *aff'd*, 342 Or 39, 147 P3d 1151 (2006), where a search warrant directed police to search for a detailed list of items including controlled substances, drug paraphernalia, other materials related to the manufacture and distribution of controlled substances, and firearms. However, the warrant did not authorize the seizure of any of the listed items. Among the items seized pursuant to the warrant were a microcassette audiotape and a computer. On appeal, we concluded that a warrant may validly authorize police to search for items without authorizing the seizure of any of the items. *Id.* at 265. We also remanded for the trial court to determine whether the items seized constituted incriminating evidence based on the plain view doctrine. *Id.* at 268. Based on our holdings in *Carter*, the trial court in this case reasoned that, "the detectives should have looked no further until after they had obtained a warrant to seize and then search the remainder of the files and images on the CD provided to them by Wells."

The trial court's holding pertaining to the scope of authority conferred by the provisions of the search warrant to search defendant's residence and seize items from there is easily disentangled from the issue of whether Bile's viewing of the CD made by Wells from Wells's computer was an unreasonable search within the meaning of Article I, section 9.[3] Indeed, the trial court's analysis did precisely that when it ruled in favor of defendant on part of his motion to suppress and in favor of the state on the remainder of the motion. Factually, the issues are framed by different circumstances, those occurring at Wells's repair shop and those occurring at defendant's residence. Also, the legal issues framed by the

---

[3] Defendant's other assignments of error are derivative of his first assignment.

two discrete events referred to above are not inextricably linked. The issue with regard to the scope of warrant authority is a different legal issue from whether a "search" occurred when Biles viewed Wells's CD. A brief discussion of when a "search" occurs under Article I, section 9, illustrates the point.

██ ██ Generally, a search occurs when the government invades a protected privacy or possessory interest of the defendant. Privacy interests are commonly circumscribed by the space in which they exist, *i.e.*, the private space of a person. *State v. Smith*, 327 Or 366, 372-73, 963 P2d 642 (1998). Nonetheless, in the abstract, the absence of a physical or sensory invasion of a private space does not necessarily defeat a claim that government conduct constitutes a search for purposes of Article I, section 9. *State v. Meredith*, 337 Or 299, 304, 96 P3d 342 (2004). For example, in *State v. Campbell*, 306 Or 157, 759 P2d 1040 (1988), the police, acting without a search warrant, attached a radio transmitter to the defendant's vehicle that enabled them to track its location. The Supreme Court held that the attachment and the monitoring of the signal from the transmitter constituted a search under Article I, section 9. *Id.* at 172.[4]

██ It follows from the above discussion that defendant's assignments of error are not inextricably linked, factually or legally, to the state's appeal because the factual circumstances and the legal issues that defendant frames are dissimilar to the factual circumstances and the legal issue upon which the state's appeal was predicated. As a result, under the holding in *Shaw*, we must decline to exercise our discretion under ORS 138.040 to review any of defendant's assignments of error on cross-appeal at this time.[5]

---

[4] Defendant does not appear to contend that his privacy was invaded by a form of electronic surveillance such as occurred in *Campbell* and *Meredith*.

[5] Properly framed, the issue raised by defendant's cross-appeal is whether a "search" occurs when a third person acquires private information and then delivers that information to the police. *See, e.g., Walker v. Penner*, 190 Or 542, 227 P2d 316 (1951) (holding that there was no violation of Article I, section 9, when a private citizen removed incriminating evidence from a wrecked car and delivered it to the police); *see also Burdeau v. McDowell*, 256 US 465, 475, 41 S Ct 574, 65 L Ed 1048 (1921) (holding that no government search occurred within the meaning of the Fourth Amendment to the United States Constitution when a thief stole private papers belonging to the defendant and delivered them to law enforcement officers).

The dissent disagrees. The dissent criticizes the majority for not deferring to the Chief Judge's exercise of discretion when he preliminarily denied the state's motion to dismiss defendant's cross-appeal on the basis of the holding in *Shaw*. 231 Or App at 92 (Sercombe, J., dissenting). With respect, our decision is based not on any exercise of unfettered discretion on our part but on our understanding of the holding in *Shaw*. *See State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000) ("If there is only one legally correct outcome, then 'discretion' is an inapplicable concept."). The *Shaw* court's interpretation of ORS 138.040 is clear: the statutory discretion to entertain a cross-appeal has been significantly restricted by the court's interpretation of the statute, and its interpretation has the same force of law as if those limitations were written into the statute itself. *See Stephens v. Bohlman*, 314 Or 344, 350 n 6, 838 P2d 600 (1992) ("When this court interprets a statute, that interpretation becomes a part of the statute as if written into it at the time of its enactment.").

Also, part of the dissent's disagreement is based on the fact that the state's notice of appeal incorporated by reference the portion of the court's order granting defendant's motion to suppress evidence derived from the police viewing the "Thumbs 31" file, a file that Wells had copied but not viewed. Apparently, that inclusion in the notice of the appeal, in the dissent's view, ought to change the result under *Shaw*. We are not persuaded by the dissent's argument. The state's motion to dismiss its appeal implies that it no longer relies on any evidence from the "Thumbs 31 file," and indeed, the trial court's order concerning that file has the legal effect of being a final order because of the state's dismissal of its appeal. It is

---

Arguably, defendant maintained a privacy interest in the information in his computer files even though he authorized them to be copied to Wells's computer. *See, e.g., State v. Johnson*, 340 Or 319, 336, 131 P3d 173 (2006) (holding that the defendant had a cognizable privacy interest in the content of his telephone calls). Because we decline to exercise our discretion under ORS 138.040 to review defendant's cross-appeal for the reasons expressed above, we do not decide whether a "search" of a defendant's private information or "papers" by the government occurs within the meaning of Article I, section 9, when a third party in possession of such a container authorizes the police to view the contents of the container. *But see State v. Tanner*, 304 Or 312, 323, 745 P2d 757 (1987) ("In general * * * the entrustment of an effect to another is sufficient to establish a privacy interest that is violated when the effect is discovered through an unlawful search.").

not apparent to us why that result should require consideration of defendant's cross-appeal regarding Wells's copying of defendant's computer records, the subsequent issuance of a search warrant for the search of defendant's residence based on the information given by Wells to the police, and the suppression of defendant's statements made to the police in light of the policy issues discussed above by the *Shaw* court.

The dissent also contends that given the delay in the prosecution of the cross-appeal, "postponing final resolution of the important search and seizure issues in this case is unfair to defendant and squanders the significant resources of this court already expended on this case." 231 Or App at 92 (Sercombe, J., dissenting). But, as the *Shaw* court pointed out in its opinion, no unfairness to defendant is caused by the dismissal of his cross-appeal when he will have a complete opportunity to appeal the trial court's suppression order if convicted. For that matter, we do not know what evidence will be offered by the state at trial in light of its intent to seek the issuance of another search warrant to search the items seized from defendant's residence. Also, as to the resources utilized by this court to date in considering defendant's cross-appeal, it is unlikely, for the same reason that this case would be finally resolved by any decision made by us even if we were to exercise jurisdiction.

We conclude, based on the pronouncement in *Shaw*, that to refuse to dismiss defendant's cross-appeal would fall outside the boundaries of the discretion conferred by ORS 138.040 on this court.

Cross-appeal dismissed; case remanded for further proceedings.

**SERCOMBE, J.,** dissenting.

I respectfully dissent from the majority's dismissal of defendant's cross-appeal. The issue presented is whether this court should exercise its discretion to consider defendant's cross-appeal under ORS 138.040. The rule that guides the exercise of that discretion, under *State v. Shaw*, 338 Or 586, 618, 113 P2d 898 (2005), is that the "ordinary practice" of the court is to consider "only * * * [defendant's] assignments of error that are inextricably linked, either factually or

legally, to the state's assignments of error on appeal." In this case, the state appealed from a ruling granting a motion to suppress some of the evidence obtained from the police examination of the Wells compact disk (CD) because that search violated Article I, section 9, of the Oregon Constitution. One of defendant's assignments of error seeks review of part of the same ruling denying the motion to suppress other evidence obtained from the police examination of the Wells CD. Same motion, same ruling, evidence from the same CD, all arising under Article I, section 9—it is difficult to avoid the conclusion that the parties' contentions were "inextricably linked" both "factually and legally."

The majority avoids reaching that conclusion by focusing the *Shaw* analysis on the ruling from which the state "principally" appealed. *See* 231 Or App at 86-87. The state appealed from a July 22, 2005, order granting defendant's motions to suppress. That order was adverse to the state in two respects. The order suppressed evidence that the "police obtained through their search of items seized from [defendant's] residence * * * because the warrant did not authorize a search of those items." The majority contrasts the legal and factual issues concerning that part of the order with defendant's appellate contentions in applying the "inextricably linked" test under *Shaw*.

The order under review, however, also suppressed some of the "evidence police obtained in connection with their review of the CD provided to them by computer repairman Ron Wells." The majority ignores the state's appeal from that part of the order in applying *Shaw*. Defendant assigns error to the trial court's denial of its motion to suppress other evidence seized as part of the police review of the Wells CD. Resolution of that assignment of error involves the same motion to suppress, trial court order, evidence, and legal analysis as would be involved in determining the equivalent part of the state's appeal. The parties' respective contentions about the evidence on the Wells CD were "inextricably linked."

Moreover, the issue of the court's exercise of its discretion in this case under ORS 138.040 does not arise in the course of the "ordinary practice" of this court. The dismissal of defendant's cross-appeal at this point—four years after the

filing of the cross-appeal, two years after our denial of the
state's motion to dismiss on the basis of *Shaw*, 16 months
after the close of briefing on the cross-appeal, and over one
year after the case was argued—would be extraordinary.
Given that delay, postponing final resolution of the impor-
tant search and seizure issues in this case is unfair to defen-
dant and squanders the significant resources of this court
already expended on this case.

Finally, it should not be the "ordinary practice" of
this court to revisit discretionary decisions made by the Chief
Judge or a different panel of the court unless the prior exer-
cise of discretion was beyond the decision-maker's authority.
The state's motion to dismiss the cross-appeal on the basis
of *Shaw* was denied by an order by Chief Judge Brewer on
June 22, 2007. The order announced reasons why the court
was exercising its discretion under ORS 138.040 to deny the
motion to dismiss. Perhaps the majority would exercise that
discretion differently. But that difference should not justify
reversal of a prior decision of this court on which the parties
have relied in briefing and arguing the case.

Thus, I would conclude that the majority errs in dis-
missing defendant's cross-appeal for lack of jurisdiction
under ORS 138.040. In my view, the court should decide the
appeal and reverse the part of the trial court order that
denied defendant's motion to suppress evidence obtained
from the Wells CD. My reasons are explained below, follow-
ing a restated history of the case.

## THE FACTS

The charges against defendant arise out of the dis-
covery of child pornography on his personal computer by a
computer repair technician.[1] Defendant brought his old com-
puter to a computer repair shop owned and operated by
Wells. He asked Wells to repair the computer, copy the files
that existed on its hard drive, and transfer those files to
floppy disks for transferring those files to a new computer.
Defendant specifically instructed Wells not to look at the

---

[1] Defendant does not concede that the images found on his computer are child
pornography. I refer to them as child pornography as the parties do in their briefs.

image files on the computer because those files contained private information, *i.e.,* pictures of his wife in the nude. Wells copied the entire contents of the hard drive of defendant's computer to his own computer. That copying is a standard protocol that preserves data in the event of a mishap. While copying the files, Wells noticed a file named "Sierra" that he recognized as a file name commonly associated with gaming activities. Wells was uncertain whether defendant would want the contents of a game file transferred to the new computer. Wells opened the file and discovered "multiple disturbing images of what appeared to be children engaging in various sexual acts." After defendant retrieved his computers from the repair shop, Wells reported the discovery to the Multnomah County Sheriff's Office. The matter was referred to the Portland Police Bureau.

Two months later, Detective Biles interviewed Wells at the repair shop. In the meantime, and on his own volition, Wells copied the files containing the offensive images to a CD and then erased the files from his own computer. Wells gave the CD to Biles. Biles then viewed the images on the CD on his office computer and confirmed that they contained child pornography.[2]

The case was assigned to Detective Andrews. Biles gave Andrews the CD, who then opened and viewed the file identified by Wells as the "Sierra" file and determined that it contained 287 pornographic images. In addition, Andrews opened another file named "Thumbs 31" and found more images, for a total of approximately 800 images on the CD. Andrews interviewed Wells who told her that he believed there were 250 to 300 images of child pornography on defendant's computer, describing some pictures in detail to the detective, including the ages of the children and the nature of the sexual contact depicted.

Andrews obtained a search warrant and executed it at defendant's residence. Detectives read the search warrant

---

[2] The trial court noted:

"Images from the CD were viewed using a digital photograph viewer, which is available as software. Detective Biles testified the digital photograph viewer software he used to view the images on the CD allowed him to see 50 to 100 images at once in 'thumbnail' format."

to defendant and told him that they wanted to ask him some questions. Before defendant was questioned, however, he read aloud and signed a written *Miranda* warning and consent form and indicated his understanding of the warning. Despite being told he did not have to talk to the detectives, defendant did so voluntarily.

Defendant was indicted on 40 counts of encouraging child sexual abuse in the second degree, ORS 163.686. Before trial, defendant moved to suppress evidence that he contended was obtained unlawfully by the police. Defendant moved to suppress the evidence obtained from the computers seized during execution of the search warrant. Relying on Article I, section 9, of the Oregon Constitution, he contended that the warrant did not authorize the search of the contents of the computers, only their seizure, and that the warrant was otherwise overbroad and unsupported in fact. Defendant separately moved to suppress evidence obtained from the police examination of the Wells CD without a search warrant. Defendant finally moved to suppress evidence of his statements to the police during the execution of the search warrant.

The trial court partially granted the motions to suppress. The court allowed the motion to suppress evidence seized under the search warrant because the warrant only allowed seizure of the computers and not a separate search of those computers. The motion to suppress evidence of defendant's statements to police was denied. The court partially allowed and partially denied the motion to suppress evidence obtained from the Wells CD. It concluded that defendant lost privacy rights in the computer files that had been viewed by Wells, but retained those rights in the other, unseen computer files. Those rulings were made in a July 22, 2005, order that made findings and conclusions and then provided:

"IT IS HEREBY ORDERED that Defendant's motion to suppress evidence police obtained through their search of items seized from his residence is GRANTED because the warrant did not authorize a search of those items.

"IT IS FURTHER ORDERED that Defendant's supplemental motion to suppress evidence police obtained in connection with their review of the CD provided to them by

computer repairman Ron Wells is GRANTED in part and DENIED in part.

"* * * * *

"IT IS FURTHER ORDERED that Defendant's motion to suppress the statements he made to Detectives Geiger and Andrews is DENIED because the statements were voluntarily given after Defendant was advised of his *Miranda* rights."

On August 12, 2005, the state filed its notice of appeal under ORS 138.060(1)(c) "from the order granting defendant's motions to suppress, entered on July 22, 2005."[3] On August 17, defendant filed his cross-appeal under ORS 138.040, reciting:

"The State of Oregon has given notice of its appeal from those portions of the trial court's order granting defendant's motion to suppress, entered on July 22, 2005 by Judge Marilyn E. Litzenberger. Defendant hereby gives notice of cross-appeal from said order and Judge Litzenberger's supplemental order to the extent they denied defendant's motion to dismiss."[4]

The state moved to dismiss its appeal on October 4, 2006. That motion was granted, and defendant filed his opening brief on the cross-appeal on February 20, 2007. The state had not moved to dismiss the cross-appeal at that time.

Two months later, the state moved to dismiss the cross-appeal, relying on *Shaw*. The state argued that the

---

[3] ORS 138.060(1)(c) provides:

"The state may take an appeal from the circuit court to the Court of Appeals from:

"* * * * *

"(c) An order made prior to trial suppressing evidence[.]"

[4] ORS 138.040 provides, in part:

"Except as provided under ORS 138.050, the defendant may appeal to the Court of Appeals from a judgment or order described under ORS 138.053 in a circuit court, and may cross-appeal when the state appeals pursuant to ORS 138.060(1)(c) or (2)(a). The following apply upon such appeal or cross-appeal:

"(1) The appellate court may review:

"(a) Any decision of the court in an intermediate order or proceeding."

court should exercise its discretion to dismiss the cross-appeal under ORS 138.040 based on considerations of judicial economy and avoidance of unnecessary delay, and because defendant's claims were no longer "inextricably linked" to the state's. Defendant claimed that a dismissal of the appeal would be unfair to him, and that a resolution of the substantive issues were needed sooner than later.

Chief Judge Brewer ruled on the motion to dismiss on June 22, 2007, in an order that provided:

> "In April 2007, the state moved to dismiss defendant's cross-appeal on the ground that dismissal of the cross-appeal would promote judicial economy and prevent delay. The motion is denied on the ground that dismissal of defendant's cross-appeal would result in unfair expense to the defendant and would render purposeless the five months of delay between the date the court dismissed the state's appeal and the date the state moved to dismiss defendant's appeal."

Thereafter, the state responded to defendant's briefing and asked that the order be affirmed, rather than seeking dismissal of the appeal.

## JUSTICIABILITY OF THE CROSS-APPEAL

The majority decides that the cross-appeal is not justiciable under ORS 138.040. In *Shaw*, the Supreme Court examined ORS 138.140 and determined:

> "By providing that this court 'may' review any intermediate decision of the trial court on a defendant's cross-appeal from a state appeal under ORS 138.060(2)(a), ORS 138.040 reserves to this court's sound discretion the decision whether to undertake such a review."

338 Or at 617. The court then noted that an appellate court "should limit the exercise of its discretion under ORS 138.040 to review a defendant's challenges to a trial court's intermediate rulings raised by cross-appeal" because of the desirability of conserving judicial resources and the need to avoid prolonging appeals from intermediate rulings. *Id.* at 618. The court concluded that "this court's ordinary practice will be to limit its consideration only to those assignments of error that

are inextricably linked, either factually or legally, to the state's assignments of error on appeal." *Id.* at 618-19.

Relying on that holding, the majority writes:

"We conclude that the requirements of the *Shaw* test are not satisfied by the record underlying defendant's cross-appeal. The state appealed principally from a ruling regarding the scope of the search warrant and whether its language authorized the police to open the computer files that had been seized from defendant's residence. The body of law that governs that issue is unrelated to the jurisprudence that governs defendant's assignments of error."

231 Or App at 86-87. Only after the initial *Shaw* analysis does the majority note that the state's notice of appeal also incorporated the court's order granting in part defendant's motion to suppress evidence derived from the police viewing the Wells CD. 231 Or App at 89-90. The majority views it as unnecessary to analyze that portion of the order regarding the Wells CD under *Shaw* in light of the state's dismissal of its appeal. *Id.* I respectfully disagree.

To reiterate, the order under review decided two separate motions adversely to the state—a motion to suppress evidence seized pursuant to the search warrant and a supplemental motion to suppress the evidence obtained from the Wells CD. The latter motion was granted in part, suppressing evidence of computer files that had not been viewed by Wells.

Defendant's first assignment of error is that the trial court erred in not granting the supplemental motion to dismiss in its entirety. That is, defendant contends on appeal that he retained a privacy right in the data stored on the Wells CD, whether or not some of that data had been accessed by Wells. Defendant argues that the police use of mechanical means to manipulate that data was a search that required a warrant under Article I, section 9, of the Oregon Constitution.

The legal issues presented by defendant's first assignment of error—whether defendant retained any privacy rights in the Wells CD data and whether the police examination of that information was a search—are the same

legal issues that would arise in determining the state's appeal of the court's order on the supplemental motion to suppress. I would conclude, as set forth below, that the police needed a warrant to examine the contents of the Wells CD, without regard to whether a third party had examined part of its contents. Had the court reached the merits of defendant's first assignment of error, and reached that same conclusion, its holding would necessarily validate the part of the court's order that was adverse to the state. Those parts of defendant's appeal and the state's abandoned appeal from the same part of the court's order are not only "inextricably linked," in the words of *Shaw*, *they also arise from exactly the same facts and present exactly the same legal issues*.

The necessary linkage under *Shaw* is not lost when the state abandons its appeal. In *State v. Atkinson*, we previously held:

> "ORS 138.040 expressly authorizes a defendant to cross-appeal, and once he has filed his notice of cross-appeal within the time permitted, this court acquires jurisdiction. The state may not oust jurisdiction by dismissing its appeal."

64 Or App 517, 519 n 1, 669 P2d 343 (1983).

Even if one were to conclude that the "inextricably linked" test under *Shaw* is not met when the state withdraws its appeal and there are no appellate contentions to compare, and that *Atkinson* is no longer dispositive, there are substantial reasons to exercise our discretion to allow continuation of defendant's appeal under ORS 138.040. The *Shaw* court states the "inextricably linked" test as one of the "ordinary practice" of the court. *Shaw*, 338 Or at 618. As the majority notes, that "ordinary practice" is derived from the interests of an appellate court in the promotion of "judicial economy at the appellate level" and avoiding "the delay of the defendant being brought to trial." 231 Or App at 85-86.

Whatever those policy interests may be at the *beginning* of an appellate process, they are no longer in play at the *end* of that process. The dismissal of the appeal by the majority comes four years after the filing of the cross-appeal, 16 months after the close of briefing, and one year after oral

argument of the case. When, as here, a case has been briefed and argued and an opinion is in the works, there is little judicial economy to be had or delay to be avoided by dismissing the case.

Beyond the squandering of already invested judicial resources, there are other considerations that suggest that our "ordinary practice" not guide the exercise of discretion under ORS 138.040 in this case. First, the state invited continuation of defendant's appeal by initially seeking to dismiss only its appeal. The state moved to dismiss defendant's appeal months later, only after the filing of defendant's opening brief. Having induced the appellate journey, and followed defendant in its path, the state ought not to champion cancellation of the trip.

Second, justice delayed is justice denied. This case presents questions of first impression on the application of Article I, section 9, to electronically stored information. If not resolved now, those questions will require resolution by this court in this case if it proceeds to defendant's conviction on the basis of the evidence at issue and to a second appeal. More importantly, an authoritative ruling on the way that Article I, section 9, applies to electronically stored information at this time would be of great benefit to the parties and the trial court in any trial of this case. Having sought that insight for four years, it is unfair to defendant to postpone consideration of the issue to a later time.

Based largely on those reasons, this court denied the state's motion to dismiss the cross-appeal over two years ago. Chief Judge Brewer's June 22, 2007, order reasoned that "dismissal of defendant's cross-appeal would result in unfair expense to the defendant and would render purposeless the five months of delay between the date the court dismissed the state's appeal and the date the state moved to dismiss defendant's appeal."

Our earlier decision was within the range of discretion given to the court under ORS 138.040 for the reasons state above. I do not believe it to be sound policy for the court now to revisit its prior exercise of discretion merely to exercise that discretion differently. It better promotes efficiency

in the administration of appeals to respect an earlier discretionary decision made in an appeal unless that decision was outside the range of discretion allowed to the court. That is not the case here.

Because the issues raised in defendant's first assignment of error are "inextricably linked" to the facts and law involved in any appeal by the state of the supplemental motion to suppress, and because consideration of that cross-appeal better promotes policies of judicial efficiency, avoidance of further delay, and fairness to defendant under ORS 138.040, I would proceed to consider the merits of that assignment of error.

That same logic does not apply to the relationship between the parts of the order that were the subject of the state's appeal and defendant's remaining assignments of error. The fourth and fifth assignments of error concern different orders of the trial court (an order denying defendant's demurrer to the indictment and an order allowing an amendment to the indictment) that bear no relationship to the facts or legal issues involved in the state's appeal. Defendant's second assignment of error (insufficient evidence to support the search warrant) and third assignment of error (exploitation of a search unsupported by sufficient warrant) can be resolved without regard to resolution of any issues potentially raised in the state's appeal. For those reasons, I agree with the majority that defendant's appeal on those issues should be dismissed under ORS 138.040.

## LAWFULNESS OF THE POLICE EXAMINATION OF THE WELLS CD

Defendant asserts in his first assignment or error that the court erred in partially denying the motion to suppress evidence of the results of the police view of the Wells CD. As noted earlier, the trial court granted the motion to suppress evidence of the police inspection of the Wells CD "to the extent that [the detectives'] search exceeded the scope of the private citizen search conducted by Wells." The trial court's ruling limited the testimony of Wells and the detectives about the CD to testimony concerning the computer images that Wells and the police observed in common.

Defendant argues that the trial court erred in denying his motion to suppress all the evidence obtained by the police when they viewed the files on the CD provided by Wells because defendant had a protected privacy interest in all of the files. Defendant argues that, under both state and federal constitutional guarantees against unreasonable searches and seizures, the police were required to obtain a warrant before opening and viewing the files on the CD handed over by Wells. The state responds that the police were entitled to examine all of the files on the CD because defendant no longer had a protected privacy interest in the data. The state argues that defendant abandoned any privacy interest in the computer files because he had previously given the files to Wells with a significant possibility of their inspection by Wells. The state also asserts that Wells converted the information into his own property, the CD, and consented to the police examination of his own property. I would conclude that defendant had a protected Article I, section 9, privacy interest in the computer files that was not extinguished by the unauthorized viewing by Wells and would reverse the partial denial of defendant's motion to suppress.[5]

Article I, section 9, guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure."[6] The constitutional provision protects both privacy and possessory interests. *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986). A "seizure" occurs when the state significantly interferes with a person's possessory or ownership interests in property. *Id.* at 207; *State v. Heckathorne*, 218 Or App 283, 287, 179 P3d 693 (2008). Defendant does not contend that the police obtained the Wells CD through their own unlawful acts so as to effect an unreasonable *seizure* of the CD itself and the information

---

[5] Because I would resolve defendant's first assignment of error on state law grounds, I do not address defendant's federal constitutional claims. *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (questions of state law should be considered and disposed of before reaching federal constitutional claims).

[6] Article I, section 9, protects against "certain *acts* of the government." *State v. Campbell*, 306 Or 157, 166, 759 P2d 1040 (1988) (emphasis in original). The trial court found that Wells's actions in viewing the images himself were the acts of a private citizen. Those actions therefore do not implicate constitutional concerns and are not evaluated for reasonableness under Article I, section 9.

that it contained. Rather, defendant asserts that an unreasonable *search* occurred when the state examined the contents of the CD.

A search conducted without a warrant is unreasonable *per se* unless it falls within an exception to the warrant requirement. No warrant was obtained for the viewing of the files on the CD, and the state has failed to identify an applicable exception to the warrant requirement. Thus, the only argument available to the state to justify the warrantless viewing of the data on the CD was that the viewing did not constitute a "search" within the meaning of Article I, section 9.

A "search" occurs under Article I, section 9, "when a person's privacy interests are invaded by the state." *Owens*, 302 Or at 206; *Heckathorne*, 218 Or App at 287. "A privacy interest * * * is an interest in freedom from particular forms of scrutiny." *State v. Campbell*, 306 Or 157, 170, 759 P2d 1040 (1988). That interest is determined using an objective test that asks whether the government's conduct "would significantly impair an individual's interest in freedom from scrutiny, *i.e.*, his [or her] privacy." *State v. Dixson / Digby*, 307 Or 195, 211, 766 P2d 1015 (1988). Unlike in related inquiries under the Fourth Amendment to the United States Constitution, a subjective test—a person's reasonable expectation of privacy—is not used to determine a protected interest under Article I, section 9. *State v. Sanders*, 343 Or 35, 43, 163 P3d 607 (2007).[7] Thus, the privacy interest protected

---

[7] The Oregon Supreme Court has explained the difference between Article I, section 9, and Fourth Amendment jurisprudence as follows:

"This court has analyzed Article I, section 9, in a different way than the federal analysis under the Fourth Amendment, which focuses on an individual's reasonable expectations of privacy. As this court has noted, 'if subjective expectations were determinative of privacy rights, "the government could diminish each person's subjective expectations of privacy merely by announcing half-hourly on television * * * that we were all forthwith being placed under comprehensive electronic surveillance." ' *State v. Tanner*, 304 Or 312, 321-22 n 7, 745 P2d 757 (1987) (quoting Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn L Rev 349, 384 (1974)). Whether or not a particular person expects to be free from observation, therefore, is not relevant to an analysis under the Oregon Constitution: 'Rights under section 9 are defined by the privacy one has a right to expect.' *Id.*"

*State v. Wacker*, 317 Or 419, 425 n 11, 856 P2d 1029 (1993).

under the state constitution is "one of right, not of expectation." *State v. Tanner*, 304 Or 312, 321 n 7, 745 P2d 757 (1987).

That right or "interest in freedom from scrutiny" is "determined by social and legal norms of behavior, such as trespass laws and conventions against eavesdropping." *Campbell*, 306 Or at 170. The protected interest is

"not one of freedom from scrutiny in general, because, if that were the case, any form of scrutiny would infringe a privacy interest and thereby be considered a search. A court has never held, for example, that a police officer engages in a search by making unaided observations from a public place, and an individual therefore cannot be said to have a constitutionally protected interest in freedom from such scrutiny."

*Id.*

Thus, the question becomes whether defendant had an "interest in freedom from scrutiny" of the data stored on the Wells CD so as to require a search warrant prior to police inspection of the data on that CD. Under the facts of this case, the resolution of that question depends on the answers to the following inquiries: (1) whether defendant had a protected privacy interest under Article I, section 9, in the data stored on the hard drive of his personal computer, (2) whether defendant abandoned or diminished that protected interest by delivering the hard drive to Wells so that Wells could manipulate the data; (3) whether defendant lost any protected privacy interest as a result of the examination of some of the files by Wells; and (4) whether defendant retained that privacy interest when the data was copied and transferred to a different medium. I would conclude that defendant did not abandon or lose his protected privacy interest in the data stored on the hard drive of his computer and that the privacy interest continued after the data was transferred to the Wells CD. In light of those conclusions, a warrant was required before any inspection of the contents of the CD by the police.

First, there is little question that defendant had a protected privacy interest in the data stored on the hard drive of his personal computer. A personal computer often

contains records of the most intimate details of its users' lives. It is the virtual equivalent of a file cabinet containing calendars, financial records, letters, diary entries, photograph albums, and other private information. Professor Orin S. Kerr observed:

"[C]omputers are playing an ever greater role in daily life and are recording a growing proportion of it. In the 1980s, computers were used primarily as glorified typewriters. Today they are postal services, playgrounds, jukeboxes, dating services, movie theaters, daily planners, shopping malls, personal secretaries, virtual diaries, and more. As computers become involved in more aspects of our lives, they record increasingly diverse information. Each new software application means another aspect of our lives monitored and recorded by our computers. * * * As our computers perform more functions and preserve more data, we may eventually approach a world in which a considerable chunk of our lives is recorded and stored in perpetuity in our computers. These details may end up stored inside our machines in a way that can be reconstructed later by a forensic analyst with remarkable accuracy."

Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv L Rev 531, 569 (2005).

Under Oregon law, it is a crime to knowingly use or access data stored within a computer without authorization.[8] Computer users regularly use software programs to protect against unauthorized intrusions into the computer's operating system and stored data and require the entry of confidential passwords or other identification to use the machine. Under our "social and legal norms of behavior," the information stored within personal computers is regarded as confidential and private. Defendant had an "interest in freedom from scrutiny" of the data stored in his personal computer.

Second, defendant did not abandon his privacy rights in that data by engaging Wells to manipulate the information. *See State v. Purvis*, 249 Or 404, 410-11, 438 P2d 1002

---

[8] ORS 164.377 defines the elements of various computer crimes. ORS 164.377(4) provides that "[a]ny person who knowingly and without authorization uses, accesses or attempts to access any computer, computer system, computer network, or any computer software, program, documentation or data contained in such computer, computer system or computer network, commits computer crime."

(1968) (holding that under Article I, section 9, a person has no constitutionally protected privacy interest in abandoned property). The Supreme Court found an abandonment of possessory and privacy interests in *State v. Howard/Dawson*, 342 Or 635, 157 P3d 1189 (2007). In that case, the defendants sought to suppress evidence obtained by police through a warrantless search of garbage that a sanitation company picked up in the regular course of business. *Id.* at 638. The court affirmed a trial court finding that, "when defendants left their garbage for the sanitation company to collect, 'there [wa]s an intent to give up ownership[,]'" and affirmed a Court of Appeals conclusion that, in fact, the defendants had "relinquished their possessory interests in the garbage and, as a result, their privacy interests as well." *Id.* at 639. The court's conclusion, however, rested on the relationship between the defendants and the sanitation company:

> "Here, the legal relationship between defendants and the sanitation company effectively controls the question whether defendants retained a constitutionally protected privacy interest in the garbage. *See State v. Cook*, 332 Or 601, 607-08, 34 P3d 156 (2001) (recognizing that proposition). To be sure, the privacy that Article I, section 9, protects is not necessarily coextensive with property law. Rather, the degree to which property law informs questions of privacy varies with the context in which the challenged action occurs. In this context, the court has recognized that, when a person gives up all rights to control the disposition of property, that person also gives up his or her privacy interest in the property in the same way that he or she would if the property had been abandoned."

*Howard/Dawson*, 342 Or at 642-43 (citations omitted).

The legal relationship between a defendant and a third party in possession of the defendant's property was relevant in assessing the nature of privacy rights in *State v. Britten*, 89 Or App 374, 749 P2d 1193, *rev den*, 306 Or 78 (1988). In that case, the defendant rented a cabin from McComas in Montana. The defendant was arrested and detained in Oregon and was thus late in paying his rent. The defendant's mother instructed McComas to pack the defendant's belongings and to put them in storage. In the course of those efforts, McComas discovered evidence of sexual abuse

by the defendant. McComas called the sheriff's office and an undersheriff seized the evidence and sent it to police in Oregon. *Id.* at 376-77. The suppression of that evidence by the trial court was affirmed on appeal. We concluded that the defendant had not abandoned the property but instead retained a property and privacy interest in his effects. *Id.* at 377. Moreover, the defendant had not given McComas authority to examine the property and investigate for evidence of a crime. We noted:

> "McComas had the authority to do whatever was reasonably necessary to gather up and store defendant's effects. It is clear that that authority did not extend to examining defendant's ledgers and photographs and did not authorize McComas to consent to [the sheriff's] search of defendant's effects. Defendant retained a privacy interest in the effects that he entrusted McComas to store."

*Id.* at 378 (citations omitted).

By the same logic, defendant did not abandon or lessen his privacy interests in the data on the computer hard drive by entrusting the computer to Wells. Nor was the loss of those privacy rights a necessary casualty of the legal relationship between defendant and Wells. The trial court found that "defendant did not abandon his privacy interest in the contents of his computer and the other electronic storage media he left at the computer repair shop" because he "asked that his files be transferred from the hard drive on his old computer to disks so that he could load the files onto a new computer." He "specifically requested that the person transferring the files not look at image files because * * * those files contained private information, *i.e.,* pictures of his wife in the nude." As I understand the facts, the services requested from Wells did not require that he visually inspect the content of any image file.

A person can relinquish a right to privacy by revealing conduct or items in such a way as to make the conduct or items generally observable or accessible by the public at large. *State v. Louis*, 296 Or 57, 61, 672 P2d 708 (1983) (an individual can abandon his or her right to privacy by engaging in conduct "in otherwise protected areas in such a way that [his or her] * * * acts can plainly be seen or heard outside

without any special effort"). In this case, however, defendant merely took his computer to a repair shop and requested that files be copied. Defendant specifically instructed the repair technician not to view the images he was copying. There is no indication that defendant abandoned his privacy interest or in any way engaged in conduct that made the information he sought to keep from prying eyes generally observable or accessible by the public at large. As a general matter, the entrustment of an effect to another does not diminish a person's privacy interest in that effect. *See State v. Lynch*, 94 Or App 168, 171-72, 764 P2d 957 (1988) (search warrant needed for examination of contents of defendant's duffel bag stored in a car, notwithstanding consent to search by car owner); *State v. Ventris*, 164 Or App 220, 233-34, 991 P2d 54 (1999) (car owner lacked authority to consent to the search and forensic testing of a pair of pants stored in his car by the defendant).[9] I would conclude that the legal relationship between defendant and Wells and the nature of the commissioned services did not create any abandonment or diminution of defendant's privacy interests in the information stored on his computer and on the CD.

Third, defendant did not lose any privacy interest in the computer image files because the files were examined by Wells. The court reached that conclusion under analogous facts in *State v. Luman*, 220 Or App 617, 188 P3d 372, *rev allowed*, 345 Or 381 (2008). In *Luman*, the defendant videotaped women using a restroom at his place of business. He instructed his employees not to use the television attached to a video recorder that held a videotape with those images. Two employees turned on the television and watched the videotape nonetheless. The employees gave the videotape and other tapes that they discovered to the police. Police officers viewed the contents of all of the videotapes without first

---

[9] The state does not contend that Wells had actual authority to consent to the search of the CD by the police. "[W]hen the state relies on the consent of a third party to justify a search under Article I, section 9, of the Oregon Constitution, the third party must have actual authority to consent." *State v. Ready*, 148 Or App 149, 152-53, 939 P2d 117, *rev den*, 326 Or 68 (1997) (citations omitted). *See also State v. Fuller*, 158 Or App 501, 506-07, 976 P2d 1137 (1999) (third party lacked actual authority to consent to the search of the defendant's nightstand, despite her ability to open and occasionally access the nightstand's unlocked drawer, in the absence of any evidence of permission or acquiescence by the defendant).

securing a search warrant. After the defendant was charged with several counts of invasion of personal privacy, he moved to suppress the videotapes and all evidence derived from the videotapes. *Id.* at 619-20.

In *Luman,* as here, we noted that the question presented concerned the police search of the videotape and not the lawfulness of any seizure. The police obtained the videotapes lawfully. We concluded that the defendant had not abandoned any privacy interest in the videotapes. *Id.* at 622. Thus, the issue was "simply whether, by viewing the videotapes without first obtaining a warrant, [the police] unlawfully 'searched' the videotapes, in violation of defendant's rights under Article I, section 9." *Id.* at 623. More particularly, the issue was "whether the fact that [the] defendant's employees had viewed a portion of the tape before turning it over to the police somehow eliminated [the] defendant's constitutionally protected privacy interest in its contents." *Id.* at 624. We concluded that

> "the mere fact that a private third party has knowledge of the contents of something in which a defendant claims a privacy interest—even if that party conveys the information to the police—does not mean that a defendant no longer has 'the right to be free from intrusive forms of government scrutiny.' *State v. Dixson/Digby*, 307 Or 195, 208, 766 P2d 1015 (1988). Article I, section 9, does not countenance such a result."

*Id.* at 626.

That same conclusion results in this case. The fact that Wells observed some of the content of defendant's hard drive does not change the personal nature of that information or defendant's rights to safeguard that information from governmental scrutiny. The CD containing defendant's files was, in effect, a closed container. The requirement to obtain a search warrant before opening and examining the contents of the container was not excused just because the state had some evidence of its contents, in much the same way that the videotape in *Luman* was a "closed container that did not announce its contents and in which defendant retained a privacy interest when it was in the lawful possession of the police." *Id.* at 628.

Fourth, defendant's privacy rights in the information stored in his personal computer is retained even if the information is copied and stored on a medium owned by someone else. It makes little practical sense to distinguish between newly created computer files and copied files in assessing privacy rights in those files. As Professor Kerr has explained:

"All computer data is a copy. Computer hard drives work by generating copies; accessing a file on a hard drive actually generates a copy of the file to be sent to the computer's central processor. More broadly, computers work by copying and recopying information from one section of the machine to another. From a technical perspective, it usually makes no sense to speak of having an 'original' set of data. Given this, it would be troublesome and artificial to treat copies as different from originals."

Kerr, 119 Harv L Rev at 564.

Further, it is helpful to take note that, in the context of the Fourth Amendment, the United States Supreme Court has recognized a person's privacy interest in copies of personal information. *See Church of Scientology of Cal. v. United States*, 506 US 9, 13, 113 S Ct 447, 121 L Ed 2d 313 (1992). In *Church of Scientology of Cal.*, the Court decided that an appeal of a district court order requiring the delivery of copies of taped attorney-client conversations to the IRS was not moot even though the copies of the tapes had already been delivered. *Id.* at 10-13. The Court reasoned:

"Taxpayers have an obvious possessory interest in their records. When the Government has obtained such materials as a result of an unlawful summons, that interest is violated and a court can effectuate relief by ordering the Government to return the records. *Moreover, even if the Government retains only copies of the disputed materials, a taxpayer still suffers injury by the Government's continued possession of those materials, namely, the affront to the taxpayer's privacy. A person's interest in maintaining the privacy of his 'papers and effects' is of sufficient importance to merit constitutional protection.*"

*Id.* at 13 (footnote omitted; emphasis added).

If a person makes copies of computer files and stores them on a flash drive, the protection provided by Article I, section 9, against government scrutiny of that information should not dissipate merely because of the *form* of the information. Under the same logic, defendant's privacy rights in the contents of his computer hard drive are not lost because those contents are copied and portions of the information are copied again and stored in another storage device.

Nor are a person's privacy rights in electronically stored personal information lost because that data is retained in a medium owned by another. Again, in a practical sense, our social norms are evolving away from the storage of personal data on computer hard drives to retention of that information in the "cloud," on servers owned by internet service providers.[10] That information can then be generated and accessed by hand-carried personal computing devices. I suspect that most citizens would regard that data as no less confidential or private because it was stored on a server owned by someone else.[11]

---

[10] "Experts have coined the term 'Web 2.0' to describe the shift in Internet usage from consumption to participation and metaphorically refer to this virtual platform as 'the cloud,' where users interact with Internet applications and store data on distant servers rather than on their own hard drives." David A. Couillard, Note, *Defogging the Cloud: Applying Fourth Amendment Principles to Evolving Privacy Expectations in Cloud Computing*, 93 Minn L Rev 2205, 2205 (2009) (footnotes omitted).

As recently noted by the Ninth Circuit:

"The advent of fast, cheap networking has made it possible to store information at remote third-party locations, where it is intermingled with that of other users. For example, many people no longer keep their email primarily on their personal computer, and instead use a web-based email provider, which stores their messages along with billions of messages from and to millions of other people. Similar services exist for photographs, slide shows, computer code, and many other types of data. As a result, people now have personal data that are stored with that of innumerable strangers. Seizure of, for example, Google's email servers to look for a few incriminating messages could jeopardize the privacy of millions."

*United States v. Comprehensive Drug Testing, Inc.*, 579 F3d 989, 1005 (9th Cir 2009).

[11] As noted in a recent article:

"Forty-nine percent of U.S. residents who use cloud computing services would be very concerned if the cloud vendors shared their files with law enforcement agencies, according to a survey released * * * by the Pew Internet and American Life Project. Another 15 percent of respondents said they'd be somewhat concerned, according to the survey * * *.

Indeed, our case law has rejected a crabbed view that limits the protections of Article I, section 9, to the physical space owned or controlled by a person. The constitutional provision protects more than an interest against physical trespass, assault, or confinement by the government. Under Article I, section 9, "a person's right to be free from unreasonable searches extends to those places and things in which the person has a 'privacy interest,' even when there is no physical or sensory invasion into the person's own possessions or space." *State v. Johnson*, 340 Or 319, 336, 131 P3d 173, *cert den*, 549 US 1079 (2006). As held in *Campbell*, "the notion that the interests protected against government searches by Article I, section 9, are limited to interests in certain 'protected premises' is unsustainable given this court's repeated recognition of privacy as the principal interest protected against unlawful searches." 306 Or at 169.

Our precedents suggest that the existence of a protected privacy interest in private information is not determined by ownership of the storage medium for that information. In *Johnson*, the issue was whether a person had a protected privacy interest in records of cell phone usage maintained by a cellular telephone service provider. The court recognized that the "[d]efendant clearly had a cognizable privacy interest in the *content* of his telephone calls * * * [but not a privacy] interest in keeping private any records * * * respecting his cellular telephone usage." 340 Or at 336 (emphasis in original). The existence or not of a protected privacy interest was not determined by who owned the servers and other devices on which the information was stored.

---

"Sixty-nine percent of U.S. residents who are online use at least one of six popular cloud services, the survey said. Fifty-six percent of survey respondents use Web mail services, 34 percent store personal photos online and 29 percent use online applications such as Google Documents or Adobe Photoshop Express, according to the survey.

"Among the concerns about cloud computing: 80 percent of respondents said they'd be very concerned if a vendor used their photos and other information in marketing campaigns. Another 68 percent said they'd be very concerned if the vendor used their personal information stored in the cloud to deliver personalized ads to them and 63 percent said they'd be very concerned if the vendor kept their data after they tried to delete it."

Grant Gross, *Cloud Computing May Draw Government Action*, InfoWorld, Sept 12, 2008, http://www.infoworld.com/article/08/09/12/Cloud_computing_may_draw_government_action_1.html (accessed Sept 24, 2009).

Rather, a privacy interest was found not to exist in that case because the usage records were "generated and maintained * * * from the provider's own equipment and for the provider's own, separate and legitimate business purposes (such as billing)." *Id.* By contrast, a privacy interest in the content of the telephone calls, information generated by the defendant, was inferred because of statutory requirements for a warrant to intercept telephonic communications. *Id.*

In much the same way, we concluded that a defendant did not have a privacy interest in subscriber information in possession of an internet service provider in *State v. Delp*, 218 Or App 17, 178 P3d 259, *rev den*, 345 Or 317 (2008). Again, the question was not resolved on the basis of whether that information was stored on a medium owned by the service provider, but rather the lack of "any source of law that establishes that [the defendant] has some interest in keeping private the noncontent information that is held by a third party regarding his Internet usage." *Id.* at 26-27 (footnote omitted).

Because of the different nature of the privacy interests protected under the federal and state constitutions, consideration of analogous Fourth Amendment cases is helpful but not instructive. In that area of law as well, the ownership of the storage medium does not determine whether a privacy interest exists in the stored data. For example, in *Quon v. Arch Wireless Operating Co., Inc.*, 529 F3d 892, 904 (9th Cir 2008), *reh'g den*, 554 F3d 769 (2009), the Ninth Circuit held that users of text messaging services have a reasonable expectation of privacy in the content of their text messages stored on their service provider's network. In *Quon*, the service provider had archived copies of the text messages received by its server. *Id.* at 896. The Ninth Circuit concluded that it was irrelevant that the service provider may have been able to access the contents of the messages for its own purposes. *Id.* at 905. Rather, it was relevant that the users of the service "did not expect that [the service provider] would monitor their text messages, much less turn over the messages to third parties without [the users'] consent." *Id.* at 906. I would hold, then, that defendant had a privacy right under Article I, section 9, in his computer files that were copied and stored on the Wells CD.

Finally, I would conclude that the police examination of the CD was a search under Article I, section 9. I do not view this case, as the majority does, merely as one where "a third person acquires private information and then delivers that information to the police." 231 Or App at 88-89 n 5. This is not a case of a private search revealing contraband and turning that evidence over to the police. If Wells, acting on his own, had opened defendant's computer files and printed the images stored in those files and gave the prints to the police, the analysis would be different. In that case, the police would take no steps to uncover the data and make the images available for inspection. The police would have not undertaken a search, and their conduct would require no justification under Article I, section 9.

Instead, Wells gave police the CD, a container that held data in which defendant had a privacy interest. The contents of the CD were examined by the police in order to determine their relevance as proof of criminal activity. The evidence sought to be suppressed was images produced when governmental agents opened that container and subjected its contents, defendant's data, to scrutiny and manipulation. That examination of the contents of the Wells CD constituted a search under Article I, section 9, because it exposed those contents, in which defendant retained a privacy interest, to governmental review.

Again, analogy to Fourth Amendment case law is helpful. In *U. S. v. Crist*, 627 F Supp 2d 575, 585 (MD Pa 2008), a federal district court concluded that a forensic examination of the contents of a computer lawfully obtained by police was a "search" under the Fourth Amendment. In *Crist*, the government was given the defendant's computer by a third party who had discovered a folder on it containing child pornography. *Id.* at 577. The government then conducted a warrantless forensic examination of the computer, which included making an exact copy of the hard drive and running a hash value and signature analysis on that copy.[12] *Id.* at 578-79.

_____

[12] A hash value and signature analysis of files on a computer hard drive creates a "fingerprint" of each file on the computer. Once generated, those hash values can be compared to the hash values of files known or suspected to contain child pornography. *Crist*, 627 F Supp 2d at 578.

The defendant moved to suppress evidence recovered from his computer during that examination. *Id.* at 576. Among its arguments in response to the defendant's motion, the government contended that, under the Fourth Amendment, no search occurred during the forensic examination of the defendant's computer because the governmental agents "didn't look at any files, they simply accessed the computer." *Id.* at 585 (internal quotations marks omitted). The district court, however, concluded: "By subjecting the entire computer to a hash value analysis—every file, internet history, picture, and 'buddy list' became available for Government review. Such examination constitutes a search." *Id.* I would come to the same conclusion under Article I, section 9, with respect to the examination of the data on the Wells CD through a search program.

Thus, I would conclude that defendant had a recognized privacy interest in the information stored on his personal computer. ORS 164.377. That information was not generated or maintained by Wells or any third party. Article I, section 9, protects both any possessory interest in the CD from unreasonable seizure and any privacy interest in the data embedded in the CD from unreasonable search. *Owens*, 302 Or at 206. Defendant's privacy interest in that data does not change even if that data was copied, transferred, or manipulated, or stored on a medium owned by another, so long as the information was not abandoned or exposed to the public. The use of mechanical means to inspect that data was a search that required a warrant under Article I, section 9. Consequently, I would hold that the trial court erred in denying, in part, defendant's motion to suppress evidence obtained as a result of the warrantless viewing of the files on the Wells CD.